UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAMA M. SEATS,<br><br>    Plaintiff,<br><br>v.<br><br>KASKASKIA COLLEGE COMMUNITY COLLEGE DISTRICT #501 and THOMAS L. ATCHISON,<br><br>    Defendants. | Case No. 07-cv-843-JPG |

## MEMORANDUM AND ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by Defendant Kaskaskia College Community College District #501 (Doc. 78), the Motion for Partial Summary Judgment filed by Plaintiff Rama M. Seats (Doc. 79), and the Motion for Summary Judgment as to Count II filed by Defendant Thomas L. Atchison (Doc. 80).

## BACKGROUND

Plaintiff Rama M. Seats (Seats) brought this suit against Defendant Kaskaskia College Community College District #501 (the College) and Defendant Thomas L. Atchison (Atchison). Seats claims the College subjected her to an environment of sexual harassment in violation of Title IX (Count I). She claims Atchison used his position as an instructor to sexually harass her under color of state law in violation of 42 U.S.C. § 1983 (Count II). She also brought state law claims against Atchison for intentional infliction of emotional distress (Count III), assault/battery (Count IV), and damage to property (Count V). Atchison brought counter-claims against Seats for abuse of process, malicious prosecution, assault/battery, and intentional infliction of emotional distress.

1

I.  **Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000).  The Court construes all facts in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.

The moving party has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp.,* 477 U.S. at 323.  If it meets this burden, the nonmoving party must set forth facts that demonstrate the existence of a genuine issue of material fact.  Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996).  The nonmoving party must do more than cast "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).  Rather, the nonmoving party must demonstrate to the Court that the evidence is such that a reasonable jury could return a verdict in his favor.  *Anderson,* 477 U.S. at 248; *Insolia v. Phillip Morris, Inc.,* 216 F.3d 596 (7th Cir. 2000).  Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment.  *Anderson,* 477 U.S. at 248-250.

II.  **FACTS**

Taken in the light most favorable to the plaintiff, the record establishes the following

facts. Defendant Kaskaskia College Community College District #501 (the College) is a community college located in Marion County, Illinois, and is a recipient of federal funds. The College has a policy against sexual harassment. Individuals who experience or witness any conduct that may be in violation of the policy are to report that conduct to certain College officials. During the relevant time period, Rhonda Boehne, Director of Human Resources and in-house counsel for the College, Bruce Connors, Vice President of Educational Services, and Penny Brinkman, Dean of Career and Technical Education, were among the officials responsible for taking reports of sexual harassment. The policy states that upon receiving a report of sexual harassment, the College official is to immediately notify the Human Resources Department, which will begin an investigation. If the investigation confirms that sexual harassment is taking place, the College will take corrective action to prevent it from recurring.

In 2002, the College hired Seats to work as a part-time cosmetology instructor. Atchison enrolled as a student in several classes taught by Seats. In January 2006, Seats and Atchison began a consensual sexual relationship. Their relationship ended in August 2006. Also in August, Seats left her employment at the College in order to work full-time elsewhere. In December 2006, the College hired Atchison to work as a part-time cosmetology instructor for the Spring 2007 semester. In the Spring 2007 semester, in order to finish her Associate's degree, Seats enrolled as a student at the College. She took an on-campus independent study fitness class, an off-campus yoga class, and a business class. Atchison was not an instructor of any of Seats's classes.

During the Spring 2007 semester, Atchison and Seats had several disturbing encounters. In January, Atchison attempted to give Seats's children gifts. When Seats refused the gifts,

3

Atchison threw the gifts out of his car window, and began yelling and banging his head on his steering wheel. In February, Atchison offered a ride to Seats's twelve-year-old daughter. She refused the ride. Atchison then called Seats on the phone and made comments about her daughter's body and about how vulnerable her daughter was walking to school that made Seats feel uncomfortable. Atchison also intentionally ran Seats's husband off the road.

Meanwhile, Seats was sending emails to Atchison and other cosmetology department staff that the staff found disturbing. She also called one cosmetology staffer a "loser" in one of the College hallways. The staffers complained to Murlen Garner, the coordinator of the College's cosmetology program. On February 6, Garner reported the complaints to Boehne and passed along the offending emails. Boehne told Garner she would have College security ask Seats to refrain from contacting the cosmetology staff. Boehne asked Garner to advise his staff to refrain from having contact with Seats. Atchison was told to stay away from Seats on campus.

That same day, Deanna Belcher, the College's Director of Safety and Security met with Seats. Belcher told Seats that some members of the cosmetology staff were uncomfortable with Seats's behavior and told Seats to avoid future contact with them and, in turn, they would avoid contact with her. Belcher told Seats that future contact with the cosmetology staffers could result in Seats being suspended. Seats asked Belcher if she was joking, because it was Atchison who was harassing Seats, not the other way around.

Seats went to Boehne's office to report that Atchison was harassing her. Seats gave Boehne no specifics, telling Boehne that it was "a personal situation" between herself and Atchison. She told Boehne that the emails were a misunderstanding and she wanted to clear things up with the cosmetology staff. Boehne told Seats not to have any contact with the

4

cosmetology staff. Seats felt Boehne was dismissive of her complaint, because Boehne simply told Seats to avoid all contact with Atchison.

Boehne told campus security to be on the alert for potential issues between Seats and the cosmetology staff. Boehne reported both the complaints and Seats's comment that it was a "personal situation" to College President Dr. Underwood and to Penny Brinkman.

After Seats spoke to Boehne, Seats reported to Belcher that she believed Atchison had taken items from her car, including her sunglasses. Seats told Belcher that when she had attempted to take the sunglasses away from Atchison, he grabbed her hand to stop her. The incident occurred in a campus hallway. Later that same day, February 6, Atchison sat down next to Seats in the College cafeteria and made a remark about how it affected him when Seats wore skirts. He asked Seats to go into the bathroom with him for a "quickie." Seats told Atchison that they were not supposed to have contact with one another, and Atchison left.

Approximately one week later, Seats contacted Bruce Connors because she had heard from Boehne that she would never be rehired at the College. She wanted Connors to check to see if there was anything in her personnel file indicating that she was ineligible for rehire. She also reported to Connors that Atchison was harassing her. She did not provide him with specifics. Connors told Seats to speak to Boehne about the harassment issue, but Seats said she was not comfortable talking to Boehne, as she had been dismissive of Seats's complaint. Connors then told Seats to speak to Brinkman about the problem. Connors left his employment with the College that same week without having initiated an investigation into Atchison's behavior. However, he did check Seats's personnel file and told her it did not contain anything that would prevent her from someday being rehired.

5

Despite being told to stay away from Seats, Atchison did not stop contacting her when she was on campus. From January through March, Atchison came to the campus weight-room where Seats was working out between five and seven times. One time he grabbed the collar of her shirt, pulled it up, and told her it was too low cut. Another time he brought her Valentine's Day cookies, which she threw away. Another time Atchison had Seats paged in the weight-room. She refused his call.

Once Atchison went to the weight-room to deliver to Seats a bag filled with curling irons and some photos. When Seats went to throw the photos out, Atchison bent her wrist back, hurting her. He then called her as she was walking through the campus parking lot and told her he was going to run her over. Seats turned around to see Atchison in a car swerving toward her. She got into her car and locked the doors. Atchison pounded on her window. He then drove after her, chasing her all the way to her work. He sent her emails and called her from campus phones.

Atchison also contacted Seats off-campus. Sometime in February, Atchison called Seats and asked her to come over to his house. She complied, and they sat on his bedroom floor and talked. During the conversation, Atchison threatened to kill Seats if she ever told anyone he had abused her. He got mad and punched the ceiling fan blades in his room. He also showed Seats pictures of family members who had been convicted of crimes and told her that they, too, would hurt her if she ever reported his abuse. On February 23, Atchison physically assaulted Seats at a gas station in Odin, Illinois. He once confronted her at work and broke the cell phone she was using.

In March, Seats attended a birthday party for a relative of Atchison's. Atchison was also

at the party. She later met him at a restaurant, where she gave Atchison photos of the party and he gave Seats a "thank you" card from his mother. Atchison told Seats he missed her and loved her. When she rebuffed these advances, he beat her head against the car window. Seats was later diagnosed with a concussion. Atchison again threatened to kill her if she pressed charges against him. Seats sought professional counseling for guidance on how she should handle her relationship with Atchison.

On March 21, 2007, Seats obtained an emergency order of protection (OP) against Atchison. The OP directed Atchison to stay away from the weight-room when Seats was present and to not wait for her outside of her classroom. Seats provided a copy of the OP to Brinkman and to campus security. This was the first time Seats had contacted Brinkman about Atchison's behavior. However, Seats did not provide Brinkman with any examples of Atchison's conduct. Brinkman met with Atchison to discuss the OP. Atchison assured Brinkman that he had had no contact with Seats since the entry of the OP.

Garner consulted with Boehne, who told Garner that Atchison was absolutely obligated to comply with the OP. It was Boehne's understanding that an emergency OP could be entered absent any evidence of actual wrongdoing. Therefore, she did not feel that the College had any basis on which to take disciplinary action against Atchison. Boehne monitored the OP case, but the College did not conduct an independent investigation.

In late March, Seats complained to Brinkman that individuals in the cosmetology department and in security were making light of the OP. Seats told Brinkman the specifics of Atchison's harassment that had led up to her obtaining the OP. Brinkman reported the conversation to Dr. Underwood, who instructed her to conduct an investigation into whether the

7

cosmetology staff and security were making light of the OP. He did not instruct her to investigate Atchison's conduct. Brinkman's investigation concluded that Seats's belief that people were making light of the OP was unfounded.

In early May, with the OP still outstanding, the College informed Atchison that he would not be rehired when his contract expired at the end of the semester. The College removed Atchison from campus for the week of finals. Seats finished her coursework on May 10, 2007, and obtained her Associate's Degree. She received a grade of "B" in her business class, but was unable to enjoy the learning experience the way she usually does. She recieved an "A" in the fitness class, but did only the bare minimum required of her because of Atchison's behavior. She had dropped out of her yoga class when Atchison told her he was going to sign up for it.

Following graduation, Seats and two other former College students met with Boehne to complain about Atchison's behavior toward Seats. Boehne asked Seats what action Seats wanted the College to take, since Atchison was no longer an instructor there and Seats was no longer a student. Seats told Boehne that she wanted to feel safe on campus and that it was Boehne's job to figure out how to do that. Boehne spoke with Seats's attorney and Atchison's attorney and agreed to cooperate if the parties entered into a mutual restraining order and if both were to return to the College.

The College moves for summary judgment in its favor on Seats's Title IX claim. Atchison moves for summary judgment in his favor on Seats's § 1983 claim. Seats moves for summary judgment in her favor on Atchison's claims for abuse of process, malicious prosecution, and intentional infliction of emotional distress.

## ANALYSIS

I. **Sexual Harassment and Title IX**

The College contends that it is entitled to summary judgment in its favor on Count I of Seats's complaint, alleging violations of Title IX. Title IX provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Here, the College receives federal funds, and may be liable to Seats if she was subjected to an environment of sexual harassment. *See, Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992); *Davis v. Monroe County Bd. of Education*, 526 U.S. 629(1999).

However, courts do not hold funding recipients liable for sexual harassment perpetrated by their employees unless an appropriate school official received actual notice of and was deliberately indifferent to the employee's misconduct. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 292 (1989).

A. **Actionable Sexual Harassment**

The College first contends that Seats cannot show that she was subjected to actionable harassment while on campus. In order to be actionable under Title IX, the harassment to which the student is subjected must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities and benefits provided by the school." *Davis*, 524 U.S. at 650.

A rational trier of fact could find that Seats was subjected to sexual harassment that was sufficiently severe or pervasive to rise to the level of discrimination under the statute. Seats has

9

submitted evidence that Atchison made repeated, unwelcome sexual advances towards her, physically assaulted her, and threatened her life. Seats has submitted evidence that she sought professional counseling to deal with the situation and that she obtained an order of protection in reaction to Atchison's behavior. Viewed in the light most favorable to Seats, a jury could find that she was subjected to actionable sexual harassment.

B. **Actual Knowledge**

The College also contends that Seats cannot show that it had actual knowledge of the harassment because Seats never told College officials the specifics of Atchison's behavior until after the OP was in place, by which time the harassment had ceased. Seats counters that she told three officials cloaked with the authority to implement corrective measures of Atchison's harassment. "[T]he plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct, not just actual knowledge of the risk of misconduct. . . ." *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir.2004).

Seats has presented no evidence from which a reasonable trier of fact could conclude that the College had actual knowledge of Atchison's behavior until after the entry of the OP. When Seats first met with Boehne, she complained that Atchison was "harassing" her. However, Seats offered no specifics from which Boehne could have known the sexual nature of the harassment. Seats's complaint came up in the context of a conversation about Seats's behavior toward the cosmetology department, which individuals within the department found harassing. In defending herself, Seats told Boehne that she was the one who was being harassed. When Boehn inquired into the nature and circumstances of Atchison's harassment of Seats, Seats replied that it was a "personal situation." Neither the circumstances of the conversation nor Seats's replies to

10

Boehne's inquiries could have informed Boehn that Seats was the victim of severe, pervasive, sexual harassment by Atchison.

Likewise, when Seats spoke to Connors, she offered no specifics about Atchison's behavior. She was primarily concerned with the contents of her personnel file. Although she mentioned to Connors that Atchison was harassing her, without specifics Connors would not have known the nature or the extent of the harassment. Seats did not give Connors enough information from which he could begin an inquiry. Furthermore, Seats did not follow Connors's instructions to lodge her complaint with Brinkman until after the entry of the OP.

When Seats spoke to Brinkman in March about the OP, she provided specific details of Atchison's conduct for the first time. At this point, the evidence is such that a reasonable trier of fact could conclude that the College had actual knowledge that Atchison was behaving in a severe, pervasive, objectively offensive manner toward Seats. The College then had a duty to take the appropriate corrective action to remedy the sexual harassment.

### C. Deliberate Indifference

The College contends that Seats cannot establish that it was deliberately indifferent to the sexual harassment. Seats contends that the College's failure to investigate her complaints of sexual harassment prior to the entry of the OP amounts to deliberate indifference. She contends that the College "did absolutely nothing."

Title IX recipients will only be found to have been deliberately indifferent when the recipient's response or lack of response to the harassment is clearly unreasonable in light of the known circumstances. *Davis*, 526 U.S. at 648. Furthermore, the school's deliberate indifference must "at a minimum, cause students to undergo harassment or make them liable or vulnerable to

it." *Id*. at 645 (internal quotations omitted).

Here, the College's reaction was not objectively unreasonable. Even before the College had actual knowledge of the nature and extent of Atchison's harassing behavior, it took steps to keep Atchison and Seats away from one another. Atchison was told not to contact Seats. She was told not to contact anyone in the cosmetology department. Security was advised to be on the watch for potential issues between the two. Atchison did not teach in the buildings in which Seats had her classes. In short, the College tried to prevent Atchison and Seats from having any contact whatsoever. The fact that its efforts did not succeed does not make those efforts unreasonable.

Likewise, the College cannot be said to have reacted in an objectively unreasonable manner to the entry of the OP. It took steps to ensure that Atchison complied with the OP, and no evidence has been submitted that Atchison did not comply. Furthermore, the fact that the College did not open an independent investigation into Seats's allegations is not objectively unreasonable. The College monitored the OP case and, when a few weeks passed and the OP had not been lifted, the College removed Atchison from campus. He was not rehired at the close of his contract.

Although Seats believes the College should have investigated her complaints, the College behaved at all times as if Seats's complaints had merit. It separated Seats and Atchison from the first sign of trouble between the two and it removed Atchison from campus when the criminal allegations against him were not resolved. Therefore, no reasonable trier of fact could find that the College's failure to investigate Atchison amounted to deliberate indifference to sexual harassment. The College is entitled to summary judgment on Seats's Title IX Claim (Count I).

**II.     Sexual Harassment and § 1983**

Atchison contends that he is entitled to summary judgment in his favor on Count II of Seats's complaint alleging that Atchison violated Seats's right to bodily integrity, which is protected by the Fourteenth Amendment's due process guarantee, in violation of 42 U.S.C. § 1983.  Atchison argues that the record does not contain evidence from which a reasonable trier of fact could find that he acted under color of state law.  Seats maintains that Atchison was a state actor because he was an instructor at the College.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Not every action taken by a state employee can be said to have occurred under color of state law. *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989).  "Action is taken under color of state law when it involves a misuse of power, 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) (*quoting Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir.1997)).

Seats has presented no evidence that Atchison misused power that he possessed by virtue of his employment with the College.  In *Delgado v. Stegall*, 367 F.3d 668 (7th Cir. 2004), the case relied on by Seats, the plaintiff was both the student of and the office assistant to the harassing teacher.  As such, the teacher had power over the student by virtue of his state employment - a power he misused by making unwelcome sexual advances toward her.  In contrast, Atchison did not hold a position of authority over Seats, nor was he an instructor in any

13

of her classes. Atchison possessed no power over Seats by virtue of his employment at the College. Therefore, no reasonable trier of fact could find that he misused such power. It follows that no reasonable trier of fact could find that Atchison's actions toward Seats were taken under color of state law. Accordingly, Atchison is entitled to summary judgment in his favor on Seat's § 1983 claim (Count II).

### III. Supplemental Jurisdiction Over State Law Claims

Atchison urges the Court to decline, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over the remaining state law claims. Section 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In deciding whether to retain or decline jurisdiction over state law claims when no original jurisdiction claims remain pending, a district court should consider judicial economy, convenience, fairness and comity. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

The Court is granting summary judgment on Counts I and II, the only claims in this case over which it has original jurisdiction. Therefore, under § 1367(c)(3), the Court has discretion to exercise supplemental jurisdiction over the remaining claims. The Court has considered the relevant factors and finds that it is appropriate not to exercise such jurisdiction. The Court firmly believes that Illinois state courts are far better equipped to hear cases that turn on the interpretation and application of state law between citizens of Illinois. As a matter of comity and efficiency, the privilege of hearing such cases should rest with the state court system. Furthermore, it would be no less convenient for the parties to proceed in state court than in

federal court, and no unfairness would result from litigation in a state forum. For these reasons, the Court declines to exercise jurisdiction over the remaining claims in the case, and will dismiss those claims without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

The Court **GRANTS** the Motion for Summary Judgment filed by Defendant Kaskaskia College Community College District #501 (Doc. 78). The Court **GRANTS** the Motion for Summary Judgment as to Count II filed by Defendant Thomas L. Atchison (Doc. 80). The Court **DECLINES to exercise supplemental jurisdiction** over the remaining claims in this case and **DISMISSES the remaining claims without prejudice** for lack of subject matter jurisdiction. The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: December 15, 2008**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**